IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FIRST NIAGARA RISK MANAGEMENT, INC.,

                          Plaintiff,

          v.

KOLONGOWSKI, et al.

                          Defendants.

CIVIL ACTION
NO. 16-0719

**OPINION**

**Slomsky, J.**                                         **February 17, 2017**

## I.     INTRODUCTION

Plaintiff First Niagara Risk Management, Inc. ("FNRM") filed this action against Defendant Thomas Kolongowski, a former employee of Plaintiff, and Defendant Trident Risk Advisors, LLC ("Trident").  Defendant Kolongowski is the President of Trident.   In the Amended Complaint, Plaintiff alleges that Defendants committed numerous acts, including misappropriation of trade secrets, conversion of property, breach of contract, breach of the fiduciary duty of loyalty, unfair competition, tortious interference with prospective economic advantage, tortious interference with prospective contract, and civil conspiracy to obstruct justice.  (Doc. No. 21 at 12-22.)

Before the Court is Plaintiff's Motion for Contempt in which Plaintiff contends that Defendant Kolongowski violated a Stipulated Order for Preliminary Injunction and Forensic Discovery (Doc. No. 10) signed by the Honorable Stewart Dalzell on February 25, 2016.[1]  (Doc. No. 29.)  On December 13, 2016, a hearing was held on the Motion (Doc. No. 29) and Defendant

---

[1]  On August 22, 2016, the above-captioned matter was reassigned from Judge Dalzell to this Court for all further proceedings.  (Doc. No. 31.)

Kolongowski's Response in Opposition (Doc. No. 30).  For reasons discussed below, the Court will grant Plaintiff's Motion for Contempt.  (Doc. No. 29.)

## II.   FACTUAL BACKGROUND

Plaintiff designs and develops insurance programs for its business customers in need of insurance and also does a risk analysis in order to obtain cost saving policies.  (Doc. No. 21 at 2.) As a part of its business, Plaintiff "develops and maintains certain confidential proprietary and trade secret protected information that is utilized to drive its business and attempt to obtain additional customers."   (Id.)   This information includes: detailed lists of customers and prospective customers, information about customers and their insurance coverage history, insurance claims history, preferences, and buying cycles.   (Id.)   Plaintiff's confidential information is used to service existing customers and to identify prospective customers.  (Id. at 3.)

### A.  Defendant Kolongowski's Employment at FNRM and Events Leading
### to the Stipulated Order for Preliminary Injunction and Forensic Discovery

On April 7, 2014, Plaintiff hired Defendant Kolongowski as a Vice President, Regional Insurance Sales Manager.  (Doc. No. 21 at 3.)  When he was hired, Kolongowski signed an employment agreement with Plaintiff.  (Id. at 4.)  The employment agreement included a non-solicitation clause and a prohibition on using Plaintiff's confidential information.[2]  (Doc. No. 1

---

[2]   The non-solicitation clause provides in relevant part:

You agree that during the period beginning on the date of this Agreement and ending two years after the termination of your employment with the Company for any reason, except as necessary in the performance of your duties for the Company, you will not, whether directly or as an employee, agent, partner, consultant, or equity holder of any person: (a) employ or solicit for any employment or services any of the Company's employees; (b) influence or seek to influence any employee to leave the Company's employ; (c) call upon, solicit or accept business from, whether directly or indirectly through another entity or

2

at 17-19.)  These provisions applied during his employment with Plaintiff and for two years after he left FNRM.  (Id. at 18-19.)  He acknowledged that he remained under the obligations of the two-year non-solicitation clause and confidentiality provision post-employment with Plaintiff. (Doc. Nos. 29-1 at 3, 15-1 at 4.)  Kolongowski terminated his employment with Plaintiff on January 31, 2016.  (Doc. Nos. 29-1 at 3, 15-1 at 1.)

On that day, after submitting his resignation, Kolongowski emailed to his personal email account Plaintiff's entire Eastern Pennsylvania commercial book of business reports, a copy of an email that he had sent to his FNRM manager containing specific details on seven of the most recently produced new clients, and a link to proprietary FNRM marketing materials.  (Doc. No.

---

person, for your benefit or for the benefit of any other entity or person, any client, customer, prospect or referral source with whom you had business contact or provided services to, either alone or with others, while employed by the Company, or whose name became known to you during your employment with the Company.

"Confidential Information" in the employment agreement is set forth as follows:

For purposes of this Agreement, Confidential Information, includes, but is not limited to (a) lists of agents, brokers, policyholders, customers and prospects; (b) information about customers and their families known to you through your employment with the Company including but not limited to: names, contact information, insurance coverage history, claims history, investment history, preference, buying cycles, risks, characteristics, requirements, and all information housed in the Company's Customer Relationship Management system; (c) policy expiration dates, investment maturity dates, pricing patterns, renewal dates, commissions, policy terms, rates, premium costs; (d) Company business, financial and other plans, reports, records, inventions, trade secrets, strategies, budgets, accounts, projects, revenues, pricing, costs, sales, know-how and other information of a similar nature; (e) personnel information, including but not limited to information regarding the skills and compensation of other employees of the Company; and (f) other secret, confidential, or proprietary information of any nature relating to the Company, its suppliers, designers, and customers, and their respective owners, parents, subsidiaries, officers, board members, and employees, which is not generally available to the public.

(Doc. No. 1 at 17-19.)

3

21 at 6-7.)  A few days later, Plaintiff discovered not only these emails and but also the fact that Kolongowski had emailed additional information to his personal email account, including boiler plate documents, templates, and previously developed industry checklists.  (Doc. Nos. 29-1 at 3, 24 at 3.)  In view of these discoveries, Plaintiff believed that Kolongowski intended to use its confidential and proprietary information to operate his new business, Trident.  (Id. at 8.)

On February 9, 2016, Plaintiff's counsel sent Kolongowski a cease and desist letter referencing his unauthorized downloading and forwarding of Plaintiff's confidential information. (Id. at 7.)  The letter instructed him to take remedial measures including, arranging a forensic examination of his personal computer and devices, and to return the confidential information. (Id.)  In addition, on February 12, 2016, Plaintiff filed a Motion for Preliminary Injunction (Doc. No. 2) and a Complaint (Doc. No. 1), naming Kolongowski and his new company, Trident Risk Advisors, LLC, as Defendants.

### B.  Stipulated Order for Preliminary Injunction and Forensic Discovery

On February 25, 2016, Judge Dalzell approved the parties' Stipulated Injunction.[3]  (Doc. No. 10.)  The Stipulated Injunction provides in relevant part:

---

[3]   In the days prior to February 25, 2016, Kolongowski text messaged his personal friend, Joseph Dwyer.  (See Doc. No. 29-2 at 2-3.)  Their messages show that he had Dwyer work on his laptop before he turned it over for forensic imaging.  (Id.)  For example, one text message sent from Dwyer to Kolongowski on February 23, 2016 noted that the laptop was "untouchable, and ready for a bluff or real turn in to an objective 3rd party review/scrub/audit with no possible detection that you removed anything from its [hard drive]."  (Id. at 3.) Plaintiff relies on this message as an example of Kolongowski's bad faith in rectifying his prohibited conduct.

Despite the troubling content of these messages, they are not a basis for finding Kolongowski in contempt of the Stipulated Order.  This information does not reach the clear and convincing evidence standard.  See Harris v. City of Philadelphia, 47 F.3d 1311, 1321 (3d Cir. 1995).  It is unclear whether this conduct falls within the explicit language of the Stipulated Order. Moreover, the messages and any acts mentioned in them would have occurred prior to the time the Stipulated Order became effective.

(1) Defendant Thomas Kolongowski ("Defendant") is enjoined from directly or indirectly misappropriating, disclosing or using FNRM's confidential information or Trade Secrets, including specifically (a) lists of agents, brokers, policyholders, customers and prospects; (b) information about customers and their families known to him through his employment with the Company including but not limited to: names, contact information, insurance coverage history, claims history, investment history, preference, buying cycles, risks, characteristics, requirements, and all information housed in the Company's Customer Relationship Management system; (c) policy expiration dates, investment maturity dates, pricing patterns, renewal dates, commissions, policy terms, rates, premium costs; (d) Company business, financial and other plans, reports, records, inventions, trade secrets, strategies, budgets, accounts, projects, revenues, pricing, costs, sales, know-how and other information of a similar nature; (e) personnel information, including but not limited to information regarding the skills and compensation of other employees of the Company; and (t) other secret, confidential or proprietary information of any nature relating to the Company, its suppliers, designers, and customers, and their respective owners, parents, subsidiaries, officers, board members, and employees, which is not generally available to the public.

(2) Defendant is enjoined from directly or indirectly (a) soliciting for any employment or services any of the Company's employees; (b) influence or seek to influence any employee to leave the Company's employ; (c) call upon, solicit or accept business from, whether directly or indirectly through another entity or person, for his benefit or for the benefit of any other entity or person, any client, customer, prospect or referral source with whom he had business contact or provided services to, either alone or with others, while employed by the Company, or whose name became known to him during his employment with the Company, for two years from the date of his separation from FNRM ("Injunction Period"), pursuant to the provisions of his Offer Letter, dated March 27, 2014, attached as Exhibit A.

(3) Within five (5) business days of the date of this Order, Defendant will provide access to his personal computers and other devices, if any, to an independent, third-party forensic discovery vendor to be retained as an expert by FNRM's counsel for forensic review, so that FNRM can be assured that its information has not been compromised and to facilitate its return to FNRM. The vendor shall be mutually selected and agreed upon, with costs to be split evenly between the parties, or, in some other such manner as the parties may agree.

(Doc. No. 10 at 1-2.)

### C. Defendant Kolongowski's Actions After the Stipulated Order Was Signed

#### i.   Facts Specific to The Castle Group

Plaintiff argues here that Defendants violated the terms of the Stipulated Injunction by servicing through Trident a company referred to as The Castle Group.  (Doc. No. 29-1 at 11.) Kimberly McGillicuddy, Kolongowski's former direct supervisor at FNRM and a current Senior Vice President, Enterprise Sales Leader, testified at the contempt hearing that The Castle Group was and is considered a prospect of FNRM.  (Hearing Tr., 80:21-25, Dec. 13, 2016.)  On January 22, 2015, while Kolongowski was still employed with FNRM, he sent an email to Janet Castle, an employee of The Castle Group.  (Doc. No. 29-18 at 1.)  The email referenced The Castle Group's insurance policies and prior year's coverage.  (Id.)  The email concluded with "Thank you for your continued interest in First Niagara Risk Management."  (Id.)  Over a year later, on March 24, 2016, after Kolongowski left Plaintiff's employ, he forwarded documents relating to The Castle Group from his personal email account to his Trident account.  (Hearing Tr., 57:9-17, P-15, Dec. 13, 2016.)

Kolongowski testified at the contempt hearing that Trident did provide insurance services to The Castle Group.  (Id. at 62:22-25, Dec. 13, 2016.)  This was evidenced by a March 14, 2016 invoice that Trident sent for its insurance services to The Castle Group.  (Id.)  Kolongowski admitted that Trident continued to provide services to The Castle Group through December 2016, the month that the contempt hearing was held.  (Id. at 62:22-71:20, Dec. 13, 2016.)  He noted that Trident has received approximately $18,000 in revenue from The Castle Group as of December 13, 2016.  (Id. at 70:7-10, Dec. 13, 2016.)  On December 19, 2016, he produced additional invoices from Trident to The Castle Group dated from June 22, 2016 to November 9,

2016.  (Doc. No. 40-1 at 3.)  All the invoices show that Trident received $33,067.17[4] in revenue from The Castle Group through December 2016, which has not been disputed by Kolongowski. (Doc. Nos. 40-1 at 4, 40-2.)

### ii.   Personal Laptop, Cellphone, and Hard Drive

Pursuant to the requirements of the Stipulated Injunction, Kolongowski was required to provide a forensic discovery vendor access to his "personal computer and other devices" within five business days of the date of the Order.  (Doc. No. 10.)  He eventually made available three items: his personal laptop, cellphone, and a hard drive to which he transferred information.  (See Doc. Nos. 17 at 1-2, 29-1 at 4.)  Events involving each item warrant separate discussion.

On March 2, 2016, in compliance with the time requirements of the Stipulated Order, Kolongowski provided his laptop and cellphone to Plaintiff's e-discovery vendor, Epiq eDiscovery Solutions, Inc. ("Epiq").  (Doc. No. 29-1 at 4.)  Epiq imaged the laptop, and examined the laptop and cellphone using key word search terms.  (Doc. No. 21 at 9.)

Epiq found, and Kolongowski later acknowledged, that he had transferred information to an external hard drive, including files on The Castle Group and other documents taken from Plaintiff.  (Hearing Tr., 33:2-5, Dec. 13, 2016.)  These items were removed from his personal laptop before it was turned over to Epiq.  (Id.)  He did not inform Epiq of the transfer and admitted that he purposefully concealed from Plaintiff the emails concerning The Castle Group and other pertinent documents.  (Doc. No. 29-1 at 8; Hearing Tr., 46:13-47:3, Dec. 13, 2016.) By May 19, 2016, the hard drive was turned over to Plaintiff.  (Doc. No. 17 at 2.)

---

[4]   Plaintiff provided this figure in their filings.  (Doc. No. 40-1.)

### iii.     Emails

Kolongowski also made available information in his three personal gmail accounts and his one Comcast email account, albeit after numerous requests made by Plaintiff's counsel. (Doc. No. 17 at 1-2.)  On February 26, 2016, Plaintiff's counsel provided Kolongowski's counsel with an Authorization Form to collect the email addresses and password information for Kolongowski's email accounts.  (Doc. Nos. 29-1 at 8, 30 at 3, 29-5.)  Thereafter, from February 29, 2016 until April 29, 2016, Plaintiff's counsel exchanged emails with Kolongowski's counsel in an attempt to obtain this information.  (Doc. Nos. 29-5 through 29-12, 30-7, 30-11, 30-13, 30-14.)

On February 29, 2016, Plaintiff's counsel emailed Kolongowski's counsel informing him that Epiq needed Kolongowski to fill out the consent form to start the search of his personal email addresses for FNRM documents.  (Doc. No. 29-6.)  On March 22, 2016, Plaintiff's counsel again emailed Kolongowski's counsel requesting Kolongowski's permission to access the accounts and "gmail" account information.  (Doc. No. 29-7.)  His counsel stated he would forward the Form to his client.  (Id.)  Plaintiff still did not receive the consent form as requested in the March 22, 2016 email.

On April 6, 2016, Plaintiff's counsel emailed Kolongowski's counsel, again requesting the Authorization Form from Kolongowski.  (Doc. No. 29-8.)  Finally, on April 22, 2016, Kolongowski signed the Authorization Form to give Epiq access to his three gmail accounts. (Doc. No. 29-10.)  However, due to an additional security feature[5] on his gmail accounts, Epiq

---

[5]  Kolongowski's gmail accounts had a two-factor authentication security feature.  Two-factor authentication enables access to an email account by using a combination of two different security components.  Here, his personal gmail accounts were only accessible by using a password and a verification code that is sent to his cellphone each time he logs in.  (Doc. No.

could not access them without Kolongowski supplying the three verification codes, which he did not list on the Authorization Form.  (Doc. No. 29-12.)  Epiq did not receive these verification codes until after May 6, 2016, the date the Motion to Compel was filed.  (Doc. No. 14.)

Plaintiff also requested access to Kolongowski's Comcast email account.  On April 28, 2016, Plaintiff's counsel emailed Kolongowski's counsel, and requested an Authorization Form for Kolongowski's personal "Comcast" account and access to the external hard drive.[6]  (Doc. No. 29-9.)  Plaintiff discovered, through Epiq's forensic analysis, that his primary account was his Comcast email account.  (Doc. No. 29-1 at 8-9.)  Plaintiff admitted at the contempt hearing that he did not use his gmail accounts at all.  (Hearing Tr. 53:24-54:6, Dec. 13, 2016.)

On May 2, 2016, Judge Dalzell, when presented with the allegations involving Kolongowski's conduct after the Stipulated Order became effective, entered an Order to Show Cause as to why the Court should not hold Kolongowski in civil contempt.[7]  (Doc. No. 12.)  By May 5, 2016, Plaintiff filed the Motion to Compel, requesting that Kolongowski turn over the external hard drive, a second Authorization Form to access his personal Comcast account, and the verification codes that would enable Epiq to fully access his three gmail accounts. (Doc. No. 14.)  On May 19, 2016, Plaintiff withdrew the Motion because, as of that date, Kolongowski had finally provided all the requested information.  (Doc. No. 17.)

---

14-1 at 7 n.2.)  Epiq could not access each gmail account without the second factor, the verification code.

[6]  As noted, FNRM became aware of the existence of the external hard through Epiq's forensic analysis of the laptop computer.  (Doc. No. 29-1 at 7.)

[7]  Judge Dalzell entered the Order to Show Cause after "consideration of the evidence First Niagara Risk Management, Inc. presented in its motion for a preliminary injunction in the separate matter of First Niagara [Risk] Management, Inc. v. Folino, CV-No. 16-1779, revealing that defendant Thomas Kolongowski may have destroyed evidence in contravention of our preliminary injunction issued in this matter (docket entry #10) . . . ."  (Doc. No. 12.)

## III.    STANDARD OF REVIEW

Civil contempt is a "severe remedy, and should not be resorted to where there is fair ground of doubt as to the wrongfulness of the defendant's conduct." California Artificial Stone Paving Co. v. Molitor, 113 U.S. 609, 618 (1885).  The elements necessary for a finding of civil contempt are well established in the Third Circuit:

> To prove civil contempt the court must find that (1) a valid court order existed, (2) the defendant had knowledge of the order, and (3) the defendant disobeyed the order.  The validity of the underlying order is not open to consideration.  The resolution of ambiguities ought to favor the party charged with contempt.  A contempt citation should not be granted if "there is ground to doubt the wrongfulness of" the defendant's conduct.

Harris v. City of Philadelphia, 47 F.3d 1311, 1326 (3d Cir. 1995) (citations omitted).  The elements of civil contempt must be supported by clear and convincing evidence.  Id. at 1321.  However, civil contempt does not require a finding of willfulness on the part of the contemnor because "good faith is not a defense to civil contempt." F.T.C. v. Lane Labs-USA, Inc., 624 F.3d 575, 582 (3d Cir. 2010).

Civil contempt sanctions have two distinct purposes: one coercive and the other compensatory.  Harris, 47 F.3d at 1328 (citing Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 829 (1994)).  The first, "to coerce the defendant into compliance with the court's order." Robin Woods Inc. v. Woods, 28 F.3d 396, 400 (3d Cir. 1994).  The second, "to compensate for the losses sustained by the disobedience." Id.

> Compensatory awards seek to ensure that the innocent party receives the benefit of the injunction: the Court will be guided by the principle that sanctions imposed after a finding of civil contempt to remedy past noncompliance with a decree are not to vindicate the court's authority but to make reparation to the injured party and restore the parties to the position they would have held had the injunction been obeyed.

Id. (citing Hudson Transit Lines, Inc. v. Freund, 509 F.Supp 1172, 1178 (E.D.N.Y. 1981)).

"[D]ue process does require notice and a hearing before a finding of contempt is made and before the imposition of contempt sanctions so that the parties have an opportunity to explain the conduct deemed deficient . . ." Harris, 47 F.3d at 1311 (quoting Newton v. A.C.&S. Inc., 918 F.2d 1121, 1127 n.5 (3d Cir. 1990)).

## IV.   ANALYSIS

In light of the evidence presented at the December 13, 2016 hearing, the Court will grant the Motion for Contempt.  (Doc. No. 29.)  First, there was a valid Court Order.  Second, Kolongowski was aware of an Order.  Third, Kolongowski violated an Order.  Each element of civil contempt will be addressed in turn.

### A.  The February 25, 2016 Order was Valid and Kolongowski was Aware of the Order

On February 25, 2016, Judge Dalzell signed and entered a Stipulated Order for a preliminary injunction and forensic discovery.  (Doc. No. 10.)  The terms of the Order were negotiated by both parties.  (Doc. No. 29-1 at 13.)  The Order was signed and agreed to by Kolongowski's counsel.  (Doc. No. 10.)  Kolongowski was aware of the signed Order and its terms.  (Hearing Tr., 39:23-42:6, Dec. 13, 2016.)  Therefore, the first and second elements for a finding of civil contempt are clearly satisfied.

### B.  Kolongowski Violated and Continues to Violate the Stipulated Order

Despite knowing about the Stipulated Injunction, Defendant Kolongowski violated and continues to violate its terms.  First, Kolongowski and Trident's ongoing business with The Castle Group is a clear violation of the Stipulated Order.  The Stipulated Order provides:

> Defendant is enjoined from directly or indirectly . . . call[ing] upon, solicit[ing] or accept[ing] business from, whether directly or indirectly through another entity or person, for his benefit or for the benefit of any other entity or person, any client, customer, prospect or referral source with whom he had business contact or provided services to, either alone or with others, while employed by the

11

Company, or whose name became known to him during his employment with the
Company, for two years from the date of his separation from FNRM . . . .

(Doc. No. 10 at 2.)

Plaintiff submits, and the Court agrees, that The Castle Group was a prospect of FNRM.
Kolongowski himself solicited business from The Castle Group on behalf of FNRM when he
was still employed there.  (Hearing Tr., 80:21-25, Dec. 13, 2016; Doc. No. 29-18.)  On January
22, 2015, while still employed with FNRM, he sent an email to Janet Castle, an employee of The
Castle Group.  (Doc. No. 29-18 at 1.)  The email referenced The Castle Group's policies and
previous year's coverage, and concluded with "Thank you for your continued interest in First
Niagara Risk Management."  (Id.)  This is evidence of a "prospect or referral source with whom
he had business contact or provided services to, either alone or with others, while employed by
the Company."  (Doc. No. 10 at 2.)

The Castle Group is presently a client of Trident and has been one since at least March
2016, after the date the Stipulated Order became effective.  (Hearing Tr., 62:22-25, Dec. 13,
2016.)  On March 14, 2016, Trident sent The Castle Group two invoices for insurance services.
(Doc. No. 40-2 at 3-4.)  Trident continued to invoice and receive revenue from The Castle Group
through December 2016.  (Doc. No. 40-2.)  Trident invoices made available on December 27,
2016 show that a total of $33,067.17 was billed to The Castle Group.  (Doc. No. 40-1.)
Although Kolongowski testified that he considered The Castle Group to be solely his own
prospect (Hearing Tr., 127:22-23, Dec. 13, 2016), the evidence shows that The Castle Group was
a prospect of FNRM and Trident's business with The Castle Group was, and continues to be, a
violation of the Stipulated Order.  Thus, Plaintiff has proven by clear and convincing evidence
that the Stipulated Order was violated by Kolongowski and for this reason he was and is in civil
contempt of the Order.

12

Second, Kolongowski did not provide Epiq with access to the external hard drive within the time frame required by the Stipulated Order.  (Doc. No. 10 at 2.)  The Stipulated Order, dated February 25, 2016, provides that "[w]ithin five (5) business days of the date of this Order, Defendant will provide access to his personal computers and other devices, if any, to an independent, third-party forensic discovery vendor . . . ."  (Id.)  While he gave his personal laptop and cell phone to Epiq on March 2, 2016, within the court-ordered time frame, he had removed crucial documents and communications by transferring them onto the hard drive.  (Doc. No. 29-1 at 4.)  The hard drive would fall under the rubric of "other devices" stated in the Order and should have been turned over to Epiq within the five-day period.  (Doc. No. 10 at 2.)

Kolongowski testified at the contempt hearing to removing the documents relating to The Castle Group onto the hard drive.  (Hearing Tr., 33:2-5, Dec. 13, 2016.)  He had five business days from February 25, 2016 to provide access to the external hard drive on which he kept the removed documents.  (Doc. No. 10.)  However, he did not do so until about May 19, 2016, when Plaintiff withdrew its Motion to Compel and informed Judge Dalzell that they received the hard drive.  (Doc. No. 17.)  Therefore, Plaintiff has proven by clear and convincing evidence that the delay in providing the hard drive was in violation of the Stipulated Order.[8]

---

[8]  Plaintiff has not proven by clear and convincing evidence that Kolongowski should be held in civil contempt for the delay in turning over his personal email account information.  The Stipulated Order provides:

> Within five (5) business days of the date of this Order, Defendant will provide access to his personal computers and other devices, if any, to an independent, third-party forensic discovery vendor . . . so that FNRM can be assured that its information has not been compromised and to facilitate its return to FNRM.

(Doc. No. 10 at 2.)  The Stipulated Order does not explicitly reference email accounts, and the Court is not convinced that the email accounts fall under the language "access to his personal computers and other devices" used in the Order.  (Doc. Nos. 10, 30-13.)  Therefore, the delay

### C. Findings of Civil Contempt

The Court finds that Plaintiff has proven by clear and convincing evidence that Kolongowski is in civil contempt for failure to comply with the Stipulated Order dated February 25, 2016. First, he violated the Order by his involvement with, and Trident actually doing business with, The Castle Group. Second, he did not turn over his hard drive within the required five-day period under the Order.

### D. Sanctions

The Court must now determine what sanctions are appropriate. As noted above, civil contempt sanctions may be compensatory or coercive. Robin Woods Inc., 28 F.3d at 400. Plaintiff requests compensatory sanctions against Defendant Kolongowski and Trident Risk Advisors, LLC.[9] (Doc. No. 29-1 at 17.)

Plaintiff seeks compensatory sanctions equal to all monies earned by Trident from The Castle Group and any other FNRM clients or prospects.[10] (Id. at 18.) Plaintiff also correctly argues that "[b]ut for [Kolongowski's] attempts to circumvent the Stipulated Injunction, FNRM would not have had to expend significant resources to obtain access to devices that he was required to turn over for forensic imaging and examination within days of the February [25], 2016 Stipulated Injunction." (Id.)

The Court agrees, and Plaintiff is entitled to compensatory sanctions as follows:

---

in receiving Kolongowski's personal email account information is not a basis for finding him in civil contempt of the Stipulated Order.

[9] Although Plaintiff states that "FNRM is entitled to both" types of sanctions, it is not clear from its filings that it is seeking coercive sanctions. (See Doc. No. 29-1 at 17-18.) Because Plaintiff's argument focuses solely on compensatory civil contempt sanctions, the Court need not consider coercive sanctions.

[10] No evidence was presented at the contempt hearing that Trident was paid fees from any "prospect" of Plaintiff other than The Castle Group.

- All monies earned by Trident from The Castle Group, which as of December 2016 totaled $33,067.17

- Legal fees and other costs incurred by Plaintiff due to Kolongowski's noncompliance with the Stipulated Order as detailed above.

The Court will require Plaintiff to file an affidavit certifying the legal fees and costs that it incurred as a result of Kolongowski's violation of the Stipulated Order. Defendant Kolongowski shall also file an affidavit certifying the total amount Trident Risk Advisors, LLC has invoiced The Castle Group. Following receipt of the affidavit, the Court will enter an Order setting forth the total amount Kolongowski must reimburse Plaintiff for violation of the Stipulated Order.

## V.     CONCLUSION

For the foregoing reasons, the Court will grant Plaintiff's Motion for Contempt (Doc. No. 29). An appropriate order follows.